**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| BUCK CONSULTANTS, INC., | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 03-454 (JLL) |
|  | : | |
| GLENPOINTE ASSOCIATES, | : | |
|  | : | **OPINION** |
| Defendant/Counterclaimant, | : | |
| _____ | : | |

**LINARES**, District Judge.

Pending before this Court is Glenpointe Associates' ("Glenpointe") motion for summary judgment. Having considered Glenpointe's motion and the opposition submitted by Plaintiff Mellon[1], the Court decides the motion on the papers pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Glenpointe's motion is denied.

## I.       Factual and Procedural History

The facts of this case have been set forth at length in three prior opinions: (1) this Court's July 23, 2004 Opinion and Order regarding the parties' initial cross-motions for summary

---

[1] Buck Consultants, Inc. ("Buck") is the original plaintiff in this matter. However, Buck indicates in the opposition brief that it changed its name to Mellon Consultants, Inc. on October 1, 2003. (Opp. Br. n. 1.) Then, on June 1, 2004, Mellon Consultants, Inc. became Mellon Consultants, LLC. (Id.) Finally, on May 24, 2005, Mellon Consultants, Inc. entered into an Assignment and Assumption of Lease and assigned its interest in the lease at issue in this litigation to Mellon Financial Services Corporation #1 ("Mellon"). The Court refers interchangeably throughout the opinion to Buck and Mellon, referencing Buck as to the initial contract formation but referencing Mellon as to the arguments made in the present motion.

judgment, <u>Buck Consultants, Inc. v. Glenpointe Associates</u>, 2004 WL 5370571 (D.N.J. July 23, 2004) (Docket Entry # 24; (2) this Court's Opinion and Order regarding the parties' dual motions for reconsideration (Docket Entry # 43); and (3) the Third Circuit's decision affirming in part and reversing in part the July 23, 2004 Opinion, <u>Buck Consultants, Inc. v. Glenpointe Associates</u>, 217 Fed. Appx. 142 (3d Cir. 2007).  The Court refers the parties to those prior opinions but for the sake of completeness sets forth the facts of this case below, along with its lengthy procedural history.

### A.    Facts

Glenpointe is the owner of a mixed-use real estate complex in Teaneck, New Jersey, known as Glenpointe Centre.  (Glenpointe SOF ¶ 1.)[2]  The complex includes several structures, including a building known as Glenpointe West, which contains seven floors, each with at least 50,000 square feet of office space.  (Id. ¶ 2.)  On November 18, 1998, Glenpointe leased 69,922 square feet of space to PricewaterhouseCoopers, LLC ("PWC") for slightly more than 10 years (the "Lease").  (Id. ¶ 4.)  The Lease covered 49,175 square feet on the third floor and 20,747 on the first floor.  (Id. ¶ 5.)

In January 2002, PWC assigned its rights under the lease to EBS Acquisition Corp. ("EBS"), a wholly-owned subsidiary of Mellon Financial Corporation.  EBS then assigned the lease to another Mellon affiliate – Buck Consultants, Inc. ("Buck") – in July 2002.  (Id. ¶ 8.)  Buck was obligated to pay $ 166,064 in base rent for the space on both floors until February 2004, at which point the Lease provided for the rent to increase to $ 189,372.  (Id. ¶ 22.)  Shortly

---

[2] "Glenpointe SOF" refers to the Statement of Facts submitted in support of Glenpointe's motion for summary judgment, taking into account any objections lodged by Mellon.

after assuming the lease, Buck began searching for a subtenant to lease the entire third floor

space.  (Id. ¶ 9.)  Eventually, Buck executed a letter of intent with Eisai Corporation of North

America ("Eisai") whereby Eisai would sub-lease the third floor space for a monthly rent of

$127,641.  (Id. ¶ 10, 27.)   The proposed sublease would have ended two years before the expiry

of Buck's own lease on February 28, 2009.  (Id. ¶ 29.)

The Lease contains several paragraphs related to Buck's ability to assign or sublease the

premises.  Paragraph 11 of the Lease states in pertinent part:

> (A) Tenant, for itself, its heirs, executors, administrators, successors and assigns,
> expressly covenants that it shall not assign, mortgage or encumber this Lease, nor
> underlet, or suffer or permit the demised premises of any part thereof to be used
> by others, without the prior written consent of Landlord in each instance, as
> hereinafter set forth . . . .

(Opp. Br., Cert. of John Pendleton, Jr., Ex. 3 (the "Lease") ¶ 11.)  Paragraph 27(J) guides the

parties with respect to consent and the remedies flowing from any failure to give consent,

requiring that:

> (1)(a)   Whenever Landlord's consent or approval is required under this Lease, Landlord
> agrees that such consent or approval shall not be unreasonably withheld or
> delayed at such times as Tenant is not in default in the performance of any of its
> obligations under this lease after notice and expiration of any applicable cure
> periods provided herein.  This subsection J(1) shall apply to any provision in this
> Lease which expressly permits Landlord to arbitrarily withhold its consent or
> approval.
>
> (b)   In the event Landlord withhold such consent or approval, Landlord agrees to so
> notify Tenant in writing, specifying therein in reasonable detail, the reason(s)
> therefore.
>
> (c)   If in this Lease, it is provided that Landlords' consent or approval as to any matter
> will not be unreasonably withheld, and it is established by a court or body having
> final jurisdiction thereover that the Landlord has been unreasonable, the only
> effect of such finding shall be that the Landlord shall be deemed to have given its
> consent or approval; it being understood and agreed that in no event, shall

Landlord be liable to Tenant in any respect for money damages by reason of withholding its consent, unless such court or body specifically determines that Landlord had acted in bad faith or maliciously, subject nevertheless to the provisions of Article 30 hereof, and in no event shall Landlord be liable to Tenant for consequential or punitive damages (including, without limitations, lost profits).

(3)     If there is a dispute as to whether Landlord unreasonably withheld its consent or approval, either party shall have the right to submit such dispute to arbitration in accordance with the provisions of Article 33 hereof; provided, however, that same shall be determined under the Expedited Procedures provisions under the Commercial Arbitration Rules of the American Arbitration Association (or any organization successor thereto).

(4)     Landlord and Tenant each agree to perform all of their respective obligations hereunder in good faith.

(Id. ¶ 27.)  Finally, Paragraph 27(L) provides for "reasonable attorneys' fees" to be paid by the losing party to the prevailing party in any action or proceeding instituted in court to enforce a contractual provision or for declaratory or other relief.  (Id.)

Thus, the Lease required Buck to obtain Glenpointe's affirmative consent to the proposed Eisai sublease.  Eisai already occupied approximately 100,000 square feet of space in Glenpointe West though a direct lease with Glenpointe and several subleases that it had previously entered into with other tenants.  (Glenpointe SOF ¶ 11.)  Glenpointe indicated a concern that upon consummation of the proposed sublease, Eisai would occupy over half of the building, meaning that a large chunk of real estate could potentially fall vacant in one "fell-swoop."  (Id. ¶ 12.) Rather than consenting outright to the proposed sublease, Glenpointe began negotiating with Eisai to take on additional space in Glenpointe West along with the proposed sublet space.  (Id. ¶ 18-19.)  Eisai rejected all of these alternative proposals.  (Id.)

Finally, on December 30, 2002, Glenpointe sent Buck a letter refusing to consent to the

4

Eisai sublease.  (Id. ¶ 20.)  In that letter, Glenpointe advised Buck that "Eisai has a provision in its lease prohibiting it from subleasing or otherwise occupying any space in the building other than its premises.  Despite our good faith effort to 'negotiate around' the prohibition, Eisai was unwilling to do so."  (Stipulated SOF ¶  32-33; Pendleton Cert., Ex. 18.)[3]  Eventually, Glenpointe expounded upon its reasons for denying the proposed sublease – stating in a January 20, 2003 letter that it was "reluctant to permit a situation to occur in which 150,000 square feet will be vacant at one time."  Moreover, Glenpointe wished to "avoid a situation where it [would] be competing to lease Eisai space in 2007 with [Buck], who would have every incentive to undercut [Glenpointe] in its attempt to sublease its 70,000 square feet."  (Pendleton Cert., Ex. 25 at 2.)

Glenpointe's refusal to give consent precipitated the filing of the instant action.  Buck stopped paying rent on the portion of space that it proposed to sublease to Eisai as of February 1, 2003.  (Stipulate SOF ¶ 45.)  Since that time, Buck has only paid the rent attributable to its first-floor space.  (Glenpointe SOF ¶ 21.)  On February 5, 2003, Glenpointe notified Buck that it was in default of its lease obligations and demanded immediate payment of the balance due.  (Id. ¶ 32.)  On January 31, 2003, Buck filed the complaint initiating the present litigation.

### B.    Procedural History

The procedural history of this case spans six years.  On July 23 , 2004, this Court ruled on the parties' cross-motions for summary judgment, granting Buck's motion for summary judgment as to breach of contract and breach of the duty of good faith and fair dealing and dismissing Glenpointe's counterclaim and third-party complaint.  Buck Consultants, Inc. v.

---

[3] "Stipulated SOF" refers to the "Statement of Undisputed and Disputed Material Facts" submitted by Mellon in opposition to Glenpointe's Motion for Summary Judgment.

Glenpointe Associates, 2004 WL 5370571 (D.N.J. July 23, 2004).  This Court also granted

summary judgment in favor of Glenpointe on Buck's tortious interference claim and therefore

found both parties to be prevailing parties entitled to collect attorneys' fees.  Id.

Both sides moved to reconsider.  Buck asked the Court to reconsider the award of

attorneys' fees to Glenpointe as a prevailing party on the tortious interference claim and to

reconsider the decision to grant summary judgment on that claim.  Glenpointe moved for

reconsideration of three distinct issues: (1) the propriety of the Court's finding at the summary

judgment stage that Glenpointe had acted in bad faith; (2) whether the Court had erred in finding

that Buck could withhold the rent it was required to pay under the lease, as compared to the

lower rent it would have received under the proposed sublease; and (3) the issue of mitigation of

damages.  This Court granted Buck's motion for reconsideration, finding that only Buck was

entitled to collect attorneys' fees as a prevailing party.  (Docket Entry # 43.)  Additionally, this

Court rejected all of Glenpointe's requests.  (Id.)

On October 19, 2005, Glenpointe filed a notice of appeal to the Third Circuit.  The Third

Circuit rendered its decision on February 9, 2007, affirming this Court's finding that

Glenpointe's refusal to consent to the proposed sublease constituted a breach of the lease's

reasonable consent clause, but reversing this Court's grant of summary judgment on the issue of

whether Glenpointe had acted in bad faith in its refusal to consent.  Buck Consultants, Inc. v.

Glenpointe Associates, 217 Fed. Appx. 142 (3d Cir. 2007).  Thus, Buck is relieved from paying

$127,641 of rent – the amount of Eisai's proposed sublease – on the third-floor space for the time

period beginning on February 1, 2003 and ending on February 28, 2007.  This Court must still

decide whether Mellon is liable for the difference between the rent it would have received under

the Eisai sublease and the rent it owed Glenpointe.  Additionally, the Court must ascertain

whether Mellon owes Glenpointe for the two-year term, from March 1, 2007, to February 28,

2009, that remained on the Lease after the proposed Eisai sublease would have expired.

Glenpointe moves for summary judgment on the issue of bad faith.  Alternatively,

Glenpointe moves for partial summary judgment as to the two additional issues of damages

raised above (the rent differential between the Eisai sublease and the Buck-Glenpointe lease and

the rent associated with the two-year stub term).  Finally, Glenpointe also asks this Court to

require Mellon to place any unpaid rent into escrow pending the outcome of this litigation.  In

opposition, Mellon raises the issue of mitigation of damages and argues that it should not be

required to pay late fees on any damages owed.

## II.    Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil

Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue

of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine issue of material fact compels a

trial.  Id. at 324.   In so presenting, the non-moving party must offer specific facts that establish a

genuine issue of material fact, not just "some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   Thus, the

non-moving party may not rest upon the mere allegations or denials in its pleadings.  See

Celotex, 477 U.S. at 324.  Further, the non-moving party cannot rely on unsupported assertions,

bare allegations, or speculation to defeat summary judgment.  See Ridgewood Bd. of Educ. v.

N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).  The Court must, however, consider all facts

and their reasonable inferences in the light most favorable to the non-moving party.  See

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

**III.    Analysis**

**A.    Bad Faith**

Though affirming this Court's holding regarding Glenpointe's unreasonable denial of the

proposed Eisai sublease, the Third Circuit also held that nothing in the record warranted the

conclusion "as a matter of law that Glenpointe acted with the objective of preventing Buck from

receiving its 'reasonably expected fruits under the contract.'"  Buck Consultants, Inc. v.

Glenpointe Associates, 217 Fed. Appx. 142, 151 (3d Cir. 2007).  Thus, the Third Circuit found

that this Court had "blurred to the point of nonexistence the fine line between unreasonable and

bad faith actions."  Id.  Finally, the Third Circuit found that this Court – in addition to invoking

the wrong legal standard, "had an insufficient record upon which to base its judgment of

Glenpointe's intent at this juncture."  Id.  at 152.

Glenpointe now argues that Buck has failed to set forth any new facts since the Third

Circuit's decision, thereby warranting a grant of summary judgment on the issue of bad faith.

Mellon responds that the Third Circuit did not rule out a finding of bad faith; rather, it held that

given the facts of this case, a motion for summary judgment was an inappropriate posture in

which to find bad faith.  This Court agrees.

Following the Third Circuit's guidance, the appropriate question to ask is whether the record before this court contains an absence of material fact on the issue of whether "Glenpointe acted with the requisite subjective improper motivation of depriving Buck the benefit of its bargain." Id. Though the Third Circuit left open the possibility of awarding summary judgment on remand, id. at 152 n. 12, it also stressed the rarity of making findings of intent on a motion for summary judgment. Id. Thus, the absence of *new* facts does not equate to an absence of *material* fact – rather, the facts before this Court are sufficient to allow Mellon the chance to present its case for bad faith to a fact-finder. Mellon can argue to the fact-finder that Glenpointe's intent, as demonstrated by the initially-false reason proposed in its December 30, 2002 letter, as well as the allegedly pretextual reasons eventually offered in the January 20, 2003 letter, constituted bad faith. Thus, Glenpointe's motion for summary judgment on the issue of bad faith is denied.

### B.      Unpaid Rent

Next, Glenpointe moves for partial summary judgment on (1) the rent differential between the money to be paid by Eisai to Buck under the proposed sublease and the total amount owed to Glenpointe under the Lease; and (2) the rent owed for the the two-year period remaining on the Lease after Eisai's sublease would have expired (the "Stub Period"). Glenpointe's position is that even if a triable issue exists regarding bad faith, Mellon is still liable for the above-referenced amounts of withheld rent. Mellon argues that Glenpointe's refusal to consent to the proposed sublease is a material breach of the lease that allows it to withhold rent for the entire third-floor space.

Under Ringwood Associates, Ltd. v. Jack's of Route 23, Inc., 166 N.J. Super. 36 (App. Div. 1979), the Appellate Division agreed with the tenant that if a lease specifically precludes a landlord from withholding consent unreasonably, the landlord's breach of that provision entitles the tenant to all remedies available at law for breach of a promise, including the right to terminate the lease. Id. at 45. Thus, the Ringwood court followed the modern trend of treating the covenants in commercial leases as dependent obligations, rather than independent obligations that would require a tenant to keep paying rent even in the event of a landlord's breach. Id. Finally, the Court found that the "dependent-promises doctrine" applied only where the landlord's failure to perform had a "significant impact on the benefits the tenant anticipated he would receive under the lease" rather than simply "a peripheral effect on the use of the leased property by the tenant." Id. (citing Restatement of Property Second § 7.1 cmt c).

Here, however, the Lease not only creates a promise on the part of the landlord to not withhold rent unreasonably but it also includes a limitation on the remedies available to the tenant in the event of a breach of that provision. Thus, the remedies at law available to an aggrieved tenant, as indicated by Ringwood, are not available to Mellon if Glenpointe merely withholds consent unreasonably. The only effect of that finding, according to Paragraph 27(J)(c) of the Lease, is "that the Landlord shall be deemed to have given its consent or approval." To invoke all of the remedies available at law, as available to the Ringwood tenant, the Lease requires a finding that Glenpointe withheld consent in bad faith. This limitation on remedies expressed through Paragraph 27(J)(c) is just as much a part of the contract as the initial promise not to withhold consent unreasonably, and Mellon offers no reason wy it should not apply.

Thus, whether or not Glenpointe's refusal to consent to the Eisai sublease constitutes a

"material breach," the critical question is whether it was made in bad faith.  If so, Mellon can not

only withhold rent for the third-floor space, it can choose to terminate the contract.  If not,

Mellon's withholding of rent for the entirety of the third-floor space constitutes a violation of the

Lease, and Mellon would be liable for (1) the rent differential between the Eisai sublease and the

rent it would have owed to Glenpointe; and (2) the rent for the two-year stub term from March 1,

2007 to February 28, 2009.

Finally, the Court rejects Glenpointe's argument that Mellon – even upon a finding of bad

faith – cannot be allowed to terminate the lease only with respect to the third-floor space.  The

parties have each been performing their obligations with respect to the first–floor space, even

since the inception of the present lawsuit.  With respect to termination of the Lease, the Third

Circuit stated:

> There is nothing in the record that indicates that either party desired to terminate the
> Lease in its entirety.  Furthermore, there is nothing in law that requires that this Lease
> terminate, particularly in light of the fact that both parties continued to perform
> obligations under the Lease with regard to the approximately 20,000 square feet of
> space not touched by the proposed sublease transaction.

Buck Consultants, Inc., 2007 WL 431149, at *9.  Thus, the Third Circuit only outlawed

termination of the lease *in toto*, not termination of the lease with respect to the third-floor space.

In this case, given that the parties have no dispute with regard to the first-floor space, the Court

finds it appropriate to allow them to continue performing as to that space but to allow Mellon to

exercise its right to terminate, see, e.g., Ringwood, as to the third-floor space.  Again, however,

because of Paragraph 27(J)'s limitation on remedies, the precondition to invocation of that right

is a finding of bad faith.

11

## C.      Prejudgment Interest and Late Fees

Glenpointe argues that Mellon must pay prejudgment interest and late fees on rent monies unlawfully withheld from it.  This argument only comes into play if Glenpointe initially prevails as to bad faith.  First, with respect to prejudgment interest, Mellon raises no argument in opposition.  Thus, Mellon concedes that request, and it is granted.

As to late fees, Mellon cites to Fanarjian v. Moskowitz, 237 N.J. Super. 395 (1989), for the proposition that late fees are inapplicable in the present matter.  In Fanarjian, the Appellate Division affirmed a lower court decision denying late fees.  Id. at 401.  In that case, the commercial tenant had abandoned the premises and stopped paying rent.  The trial court found that late fees were intended to incentivize tenants to make timely rental payments and therefore did not apply when outright failure to pay rent was at issue rather that lack of timeliness in paying rent.  Id.  Glenpointe cites to no law in opposition to Fanarjian, but rather claims that the circumstances of the present case are different in that Mellon did not terminate the lease and continued to occupy the first floor.  The dispositive question, however, is not whether this situation involves the exact failure to pay rent circumstances as Fanarjian, but rather whether the issue at the heart of this litigation is failure to pay rent or lack of timeliness in paying rent.  Because late fees are an incentive to make timely rent payment, the Court holds in accordance with Fanarjian that this case – addressing the allegedly illegal failure to pay rent over the course of several years – does not implicate timeliness and therefore does not warrant the imposition of a 5% late fee.

#### D.       Mitigation of Damages

Finally, Mellon raises the issue of Glenpointe's alleged failure to mitigate damages. Mellon suggests that Glenpointe only failed to mitigate damages from February 2003 to October 2004.  Thus, in the event that Glenpointe prevails on its lack of bad faith argument, Mellon's mitigation defense covers just that 21-month period.  Glenpointe concedes, in fact, that it did not attempt to re-let the space until after October 2004.  (Stipulated SOF ¶ 48.)  However, Glenpointe notes that Mellon continued to attempt to sublet the space until October 2004 and advised Glenpointe that it was doing so in order to mitigate its damages claim.  Specifically, a Mellon representative said that "[a]s a responsibility to make reasonable attempts to mitigate our damages claim, we have continued to market the space."  (Reply Br., Kohane Cert., Ex. A.)

Given that Mellon advised Glenpointe that it was attempting to re-let the space for the February 2003 to October 2004 time period and given that its efforts were unsuccessful, this Court finds that a reduction is damages is not warranted for Glenpointe's failure to mitigate.  Not only did Glenpointe think that Mellon was making the mitigation attempt, but Mellon's failure to successfully re-let the space is indicative of the fruitlessness of any efforts that Glenpointe could have undertaken.

### IV.    Conclusion

For the reasons set forth above, Glenpointe's motion for summary judgment as to a lack of bad faith associated with its unreasonable denial of consent to the Eisai sublease is denied.  An issue of material fact continues to exist with respect to bad faith, and therefore Mellon is entitled to present its case to the fact-finder.  Next, Glenpointe's motion for partial summary judgment on

monies due in excess of the proposed Eisai sublease and for the two-year stub term is denied.

Those damages only arise if Glenpointe prevails on its claim regarding lack of bad faith.  If

Glenpointe prevails on bad faith, this Court agrees that prejudgment interest is warranted but

finds that late fees are not applicable.  On the same note, assuming damages are warranted,

Glenpointe shall suffer no reduction in their amount due to any alleged failure to mitigate

damages from February 2003 to October 2004.  And finally, Glenpointe's request to direct

Mellon to place any potential amount of damages in escrow is denied.

As indicated above, this case turns on the issue of bad faith.  Therefore, the Court will

bifurcate trial on the issues of liability and damages.  **A bench trial on the issue of bad faith is**

**hereby scheduled for April 13, 2009, at 10 AM.**

An appropriate Order accompanies this Opinion.

Dated: March 18, 2009                                          /s/ Jose L. Linares
                                                                            United States District Judge